[No. B212529. Second Dist., Div. One. June 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT JEROME BECKLEY, JR., et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III., IV., V. and VI.

510

**COUNSEL**

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant Albert Jerome Beckley, Jr.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant Darrell Amont Finn.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sarah J. Farhat and Dawn S. Mortazavi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROTHSCHILD, J.**—In this opinion we hold that the prosecution's failure to authenticate a photograph and "gang roster" downloaded from Internet Web sites should have barred their admission but that the errors were harmless as to both defendants. We also conclude there was insufficient evidence to support the street gang enhancement of each defendant's sentence. We modify the judgments as to each defendant by striking the street gang enhancements. We further modify Darrell Amont Finn's judgment by striking the gun use enhancements under Penal Code section 12022.53, subdivisions (b) through (d) and remand for resentencing. In all other respects, we affirm the judgments.

## FACTS AND PROCEEDINGS BELOW

Following a jury trial, Albert Jerome Beckley, Jr., and Darrell Amont Finn were each convicted of one count of first degree murder and two counts of attempted premeditated murder. The jury also found true as to each defendant the gang-benefit enhancement allegations under Penal Code section 186.22, subdivision (b)[1] and the firearm-use allegations under section 12022.53, subdivisions (b), (c), and (d). The court sentenced each defendant to a term of 50 years to life consisting of 25 years to life for the murder and a consecutive 25 years to life for firearm discharge by a principal resulting in death during a gang-benefiting offense (§ 12022.53, subds. (d) & (e).) Sentences on the remaining counts and enhancements were imposed to run concurrently or stayed.

We summarize the evidence in the light most favorable to the judgments.

In late April 2007, the Mahone brothers, Matthew and Jamal, attended a party in Compton where Jamal got into a fight. After the fight, Jamal agreed to meet his opponent for a rematch in South Park, a park claimed by the Southside Compton Crips as their territory. About 50 people were waiting for Matthew and Jamal and their 20 to 25 friends when they arrived at the park. The fight lasted about nine minutes. Jamal lost. Afterward, Matthew fought with Beckley and knocked him out. The two groups then fought each other. When the fighting ended, Matthew considered the "problems" between him and the other group had been settled.

Approximately two weeks later, while walking home, Matthew saw Beckley and Finn near a liquor store. Beckley called out to Matthew, "Southside Compton Crips." Matthew walked away and did not respond. He knew Beckley and Finn only by their gang monikers, "Bluebird" and "Little Freaky."

On May 14, 2007, at approximately 7:30 p.m., Matthew and Jamal were standing outside their residence, within territory claimed by the Neighborhood Compton Crips, a rival of the Southside Compton Crips. Rene Duncan, Jerrica Allen and Andrew B., a minor, were also present. A car passed by twice before stopping in front of the house. The brothers spoke with the two female occupants of the car for a few minutes. The women accused the brothers of involvement in a club shooting the prior week. When

---

[1] All statutory references are to the Penal Code unless otherwise noted.

the women asked Jamal his name and nickname, he responded, Jamal and Maleemal. After the women drove off, Matthew advised everyone to go inside because he thought they were being set up for a driveby shooting.

Within minutes, a tan or silver car similar to the one previously occupied by the two women drove by. Finn was the driver and Beckley, along with one or two others, was a passenger. Beckley, who was seated behind the driver, pulled himself partly out of the rear window and fired at Matthew, Jamal and Duncan from over the car's roof. Jamal died from a single gunshot wound to his chest. A bullet grazed Duncan's forehead and another bullet struck the side of her foot. Matthew was unharmed.

Detective Joseph Valencia, the People's gang expert, testified that Beckley and Finn were members of the Southside Compton Crips. In his opinion, this driveby shooting was in retaliation for the earlier fight in the park and "directed at members of the Neighborhood Compton Crip street gang." Valencia also testified, however, that neither Mahone brother was a member of the Neighborhood Compton Crips. Another police officer testified at trial that Beckley admitted to him in April 2007, that he belonged to the Southside Compton Crips.

Finn fled to Seattle shortly after the shooting. He was in custody there on another matter when he was interviewed by Detective Brian Schoonmaker of the Los Angeles County Sheriff's Department. In the interview Finn admitted that he belonged to the Southside Compton Crips and that he was known to his friends as Little Freaky. Finn also admitted that he was near the Mahone brothers' residence when he heard the gunshots on the night of May 14th and that he knew he was wanted for murder before he left for Seattle.

Finn did not testify.

Beckley presented a defense based on alibi and mistaken identity. He testified that he had been a Southside Compton Crips gang member but denied active membership after he began dating Kyeera Fulmore in February or March 2006. He stated that he knew Finn through working as a disc jockey at Finn's parties in Long Beach. He denied that Finn was a Southside Compton Crips gang member. Beckley also denied that he killed Jamal, had fought with Matthew at the park or had seen him at a liquor store.

Beckley's girlfriend, Fulmore, testified that Beckley babysat her two-year-old daughter at his Long Beach house while Fulmore attended classes at Camilla College from 4:00 p.m. until 10:00 p.m. Monday through Friday. She

stated that she attended class the night of May 14th and presented documentary proof of her attendance. She denied associating with gang members and stated that when she began dating Beckley she insisted he stop "running with the [gang]" and was sure that he had complied with her demand. She further testified that she had never seen Beckley and Finn together.

Tiffany Garcia testified that immediately after the shooting she saw four or five individuals in a tan car. Someone she knew as "Brim," "Dossey," or "Dorsey," not Beckley, was the person in the backseat.

In rebuttal to Beckley's and Fulmore's testimony denying Beckley's gang involvement, Detective Schoonmaker testified regarding gang-related evidence he recovered from the MySpace.com Internet accounts of Finn and Beckley.

## DISCUSSION

### I. *ADMISSIBILITY OF KYEERA FULMORE'S PHOTOGRAPH*

To rebut Fulmore's testimony that she did not associate with the Southside Compton Crips and that she insisted Beckley stop his association with the gang, the prosecution offered a photograph purportedly showing Fulmore flashing the Southside Compton Crips gang sign. Detective Schoonmaker testified that he downloaded the photograph from Beckley's home page on the Internet Web site MySpace. The trial court admitted the photograph over both defendants' objections that it had not been authenticated. We agree with defendants that the court erred in admitting the photograph but we conclude that the error was harmless.[2]

■ A photograph is a "writing" and "[a]uthentication of a writing is required before it may be received in evidence." (Evid. Code, §§ 250, 1401, subd. (a).)

■ A photograph or other writing may be authenticated by "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is" (Evid. Code, § 1400), including the two kinds of evidence described by our Supreme Court in *People v. Bowley* (1963) 59 Cal.2d 855 [31 Cal.Rptr. 471, 382 P.2d 591]. "It is well settled,"

---

[2] Our analysis is limited to whether the photograph was admissible to show that Fulmore associated with the gang and not to any other issue such as whether Beckley associated with gang members.

the court stated, "that the testimony of a person who was present at the time a film was made that it accurately depicts what it purports to show is a legally sufficient foundation for its admission into evidence." (*Id.* at p. 859.) In addition, the court noted, authentication of a photograph "may be provided by the aid of expert testimony, as in the *Doggett* case, although there is no one qualified to authenticate it from personal observation." (*Id.* at p. 862.) In *People v. Doggett* (1948) 83 Cal.App.2d 405 [188 P.2d 792], the Court of Appeal upheld the admission of a photograph showing the defendants committing a crime. Because only the victim and the defendants, none of whom testified, were present when the crime took place and one of the defendants took the photograph, there was no one to testify that it accurately depicted what it purported to show. The People, however, produced evidence of when and where the picture was taken and that the defendants were the persons shown committing the crime. Furthermore, a photographic expert testified that the picture was not a composite and had not been faked. The court held this foundation sufficiently supported the photograph's admission as substantive evidence of the activity depicted. (*Id.* at p. 410.) ▪ Citing *Doggett* with approval, the Supreme Court held in *Bowley* that "a photograph may, in a proper case, be admitted into evidence not merely as illustrated testimony of a human witness but as probative evidence in itself of what it shows." (*People v. Bowley, supra*, 59 Cal.2d at p. 861.)

Although defendants conceded that the face in the MySpace photograph was Fulmore's, the record does not contain the kind of evidence described in *Bowley* or any other evidence sufficient to sustain a finding that it is the photograph that the prosecution claims it is, namely, an accurate depiction of Fulmore actually flashing a gang sign. Schoonmaker could not testify from his personal knowledge that the photograph truthfully portrayed Fulmore flashing the gang sign and, unlike *People v. Doggett, supra*, 83 Cal.App.2d at p. 410, no expert testified that the picture was not a " 'composite' or 'faked' " photograph. Such expert testimony is even more critical today to prevent the admission of manipulated images than it was when *Doggett* and *Bowley* were decided. Recent experience shows that digital photographs can be changed to produce false images. (See, e.g., *U.S. v. Newsome* (3d Cir. 2006) 439 F.3d 181, 183 [digital photographs used to make fake identification cards].) Indeed, with the advent of computer software programs such as Adobe Photoshop "it does not always take skill, experience, or even cognizance to alter a digital photo." (Parry, *Digital Manipulation and Photographic Evidence: Defrauding The Courts One Thousand Words At A Time* (2009) 2009 J. Tech. L. & Pol'y 175, 183.) Even the Attorney General recognizes the untrustworthiness of images downloaded from the Internet, quoting the court's warning in *St. Clair v. Johnny's Oyster & Shrimp, Inc.* (S.D.Tex. 1999) 76 F.Supp.2d 773, 775 that "[a]nyone can put anything on the Internet. No web-site is monitored for accuracy and *nothing* contained therein is under oath or even subject to

independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can adulterate the content of *any* web-site from *any* location at *any* time."

■ We cannot say, however, that the admission of the photograph prejudiced Beckley or Finn.

Beckley argues that the photograph of Fulmore flashing the Southside Compton Crips gang sign damaged the credibility of Fulmore's testimony that she did not associate with gangs and that, upon her insistence, Beckley had ceased involvement with the gang. He also argues that the photograph undercut the credibility of Fulmore's testimony in support of Beckley's alibi that he was babysitting Fulmore's daughter at his home on the night of the shooting.

These arguments lack merit for several reasons. Beckley's active membership in the Southside Compton Crips at the time of the shooting was not subject to reasonable doubt. He was part of the Southside Compton Crips group that fought with Jamal's and Matthew's group in the park a month before the shooting. He called out the gang's name in a challenge to Matthew approximately two weeks before the shooting and he admitted his gang affiliation to police as recently as a month before the shooting. In addition, Fulmore's testimony did not fully support Beckley's alibi. She testified that in the month of May 2007 Beckley babysat her daughter at his home every night she attended school and that she attended school on the night of the shooting from 4:00 p.m. until 10:00 p.m. She admitted on cross-examination, however, that because she was at school she had no personal knowledge whether Beckley was babysitting at the time of the shooting. Beckley's alibi was further weakened by evidence that he lived with his aunt and her children and that they were present most days when Fulmore dropped off her daughter. Beckley produced no evidence that his aunt was not at home the night of the shooting.

In contrast to the inconclusive evidence supporting Beckley's alibi, strong evidence supported his guilt. Matthew, an eyewitness to the shooting, who had fought Beckley in the park a month before the shooting and had been confronted by Beckley at the liquor store only two weeks earlier, identified Beckley as the shooter from a book of photographs of gang members shown to him by police five days after the shooting. He also identified Beckley as the shooter at trial. Andrew B., another eyewitness, age 12 at the time of trial, identified Beckley as the shooter from a photo six-pack although at trial he denied seeing the shooter or identifying the shooter in the six-pack. Further, Beckley had a motive for the shooting—retaliation for his humiliating knockout at the hands of Matthew in the fight at the park.

Given the state of the evidence, it is not reasonably probable that Beckley would have been acquitted of the shooting if the court had not admitted Fulmore's picture flashing a gang sign.

Finn's claim of prejudice is even more attenuated than Beckley's. Finn reasons that the photograph purportedly showing Fulmore displaying the Southside Compton Crips gang sign destroyed the credibility of her testimony that she wanted nothing to do with gangs and therefore the jury likely disbelieved her testimony that she had never seen Finn in the company of Beckley. Leaving aside the weak connection of her testimony to the question of whether Finn and Beckley spent time together, the record included undisputed evidence that they had spent time together. Beckley testified that he had worked as a disc jockey at two parties organized by Finn.

## II.  *ADMISSIBILITY OF THE GANG ROSTER EVIDENCE*

As evidence that defendants belonged to the Southside Compton Crips, the prosecution offered a purported roster of the gang's members, including Beckley and Finn, which appeared on a Web page that Detective Schoonmaker printed from the Internet. The trial court admitted the evidence over defendants' objections. Only Finn has pursued the admissibility of the roster on appeal. He argues that the roster was "unauthenticated" because there was no evidence as to who created it, what it was intended to represent, whether it did in fact represent what it was intended to represent, and whether its creator had any basis in personal knowledge for including the names on the list.[3]

The printout is presumed to be an accurate representation of the Web page Detective Schoonmaker found on the Internet. (Evid. Code, § 1552, subd. (a) ["A printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent."].) The issue, however, was not whether the computer's printer could be trusted to reliably print out what was on the computer's screen or stored on some site but whether the content of what was on the site was reliable. We conclude that the evidence was insufficient to show that the writing was what it purported to be—a roster of the Southside Compton Crips. Therefore, the writing should have been excluded as unauthenticated and, therefore, irrelevant. We further conclude, however, that the error was harmless.

The requirement that a writing be authenticated before it may be received into evidence (Evid. Code, § 1400, subd. (a)) is satisfied by "intro-duc[ing] evidence sufficient to sustain a finding that it is the writing that the

---

[3] Finn does not address the question whether the Web page should have been excluded as inadmissible hearsay. Therefore, we do not address that issue.

proponent of the evidence claims it is." As a leading treatise on evidence explains: "Before a writing may be admitted in evidence, its proponent must make a preliminary showing that the writing is relevant to an issue to be decided in the action. A showing of relevancy usually means proof that the writing is authentic . . . ." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 24.13, p. 386.) Without such proof the writing is irrelevant because it has no "tendency in reason" to prove or disprove a fact at issue in the case. (Evid. Code, § 210.)

Here, Schoonmaker claimed the writing was a roster of the members of the Southside Compton Crips. Schoonmaker admitted that he did not know who authored the roster but testified that he believed "that is a roster of Southside Compton Crip gang members that they themselves put together." This evidence was insufficient to authenticate the document as a roster of the Southside Compton Crips. Schoonmaker admitted that he did not know who created the list nor did he explain the basis for his assertion that the gang members "themselves put [it] together." Moreover, he offered no evidence that the person who created the list had any personal knowledge of the members of the gang or that the persons named in the list were current gang members. Accordingly, the court should have excluded the purported roster of gang members. The court's error, however, does not require reversal of Finn's conviction because the information contained on the list was cumulative. There was other evidence of Finn's membership in the gang, including his own admission, only one month before the shooting, made to police when interviewed in Seattle, and the testimony of Detective Valencia that Finn "has been seen and congregated with other members of this particular street gang." Evidence also showed that he had a body tattoo indicating affiliation with the gang.

III.–VI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The sentence of each defendant is modified by striking the street gang enhancement. Finn's sentence is further modified by striking the gun-use enhancements under Penal Code section 12022.53, subdivisions (b) through (d) and remanded for resentencing. The causes are remanded to the trial court

---

[*]See footnote, *ante,* page 509.

with directions to prepare amended abstracts of judgment and to forward corrected copies thereof to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

Mallano, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied June 24, 2010, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied September 22, 2010, S184480.