[No. G041904. Fourth Dist., Div. Three. Dec. 16, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCENT JULIAN VALDEZ, JR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A., B., C., and E.

## COUNSEL

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARONSON, J.**—A jury convicted Vincent Julian Valdez, Jr., of two counts of attempted murder, four counts of assault with a firearm, and two counts of street terrorism (Pen. Code, § 186.22, subd. (a)), arising from two separate drive-by shootings.[1] The jury also found numerous enhancement allegations to be true, including that Valdez committed the underlying offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)), was armed and vicariously discharged a firearm in the first driveby shooting (§§ 12022, subd. (a)(1), 12022.53, subds. (d) & (e)(1)), and personally used and discharged a firearm in the second shooting (§§ 12022.5, subd. (a), 12022.53, subd. (c)).

Valdez raises a host of contentions on appeal. In the published portion of this opinion, we address Valdez's challenge to a trial exhibit consisting of printouts of his MySpace social media Internet page, which the prosecution's gang expert relied on in forming his opinion Valdez was an active gang member.

In the unpublished portion of the opinion, we address Valdez's remaining contentions. Specifically, he argues the trial court erred by denying his motion to sever the street terrorism counts from the underlying assault and attempted

---

[1] Further undesignated statutory references are to the Penal Code, except as specified in part II.D.

murder counts, and to bifurcate the gang allegations. He contends the trial court both violated his confrontation rights and abused its discretion under Evidence Code section 352 by admitting the second shooting victim's statements made in a 911 call and at the scene to a responding officer. Valdez also raises objections under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] to the admission of a tape-recorded statement he gave to investigating officers. Finally, Valdez asserts five separate challenges to the sufficiency of the evidence to support his conviction for two counts of street terrorism and the gang enhancement allegations attached to several underlying counts. As we explain, only Valdez's challenge to the gang enhancement on the second shooting has merit, and we therefore reverse that enhancement and affirm the judgment in all other respects.

I

## FACTUAL AND PROCEDURAL BACKGROUND

Around 6:30 p.m. on April 27, 2007, rival gang members in a red Honda fired shots at Isaac Villa, a member of the T.I.U. gang ("Toke It Up" or "Tag It Up"), and at Alex Urzua and Ali Hammad Guzman. The three were walking on West Alton Avenue near South Timber Street in Santa Ana. Villa had previously been involved in violent confrontations with members of the T.L.F. ("Thug Family Life") gang. The victims recounted that in the present shooting, Valdez, known by his T.L.F. gang moniker, "Yums," drove the Honda, accompanied by four or five other T.L.F. members. Before the shooting, Valdez made a U-turn, drove back, and stopped in front of Villa's group. Someone yelled out from the car, "T.L.F.," and the front passenger extended his hand out the driver's side window and fired shots at Villa's group. One bullet hit Urzua in the leg, and the car sped away. Villa and Guzman carried Urzua to Guzman's house and called for an ambulance. Two of the shooting victims knew Valdez by his "Yums" moniker, and one of them noted he recognized Valdez from Valdez's MySpace Web page.

A few months later, around 2:45 a.m. on July 29, 2007, Valdez parked an older model maroon Cadillac in an Anaheim fast food restaurant parking lot. At least one passenger, Robert Quinones, was in the vehicle with Valdez. Jonathan Kincaid, an admitted member of the Monte Black Gangster Crips who had dated Valdez's sister, rode by on a bicycle. Unlike T.I.U., Kincaid's gang was not a T.L.F. rival, nor was Kincaid riding in territory claimed by T.L.F. A witness in the parking lot observed Valdez and Quinones quickly close the doors on their vehicle and speed off after Kincaid. Valdez fired at least one shot at Kincaid, but missed. Kincaid rode his bicycle to a nearby convenience store and called 911 within a minute of the shooting. He stated

the driver of the car had shot at him, a backseat passenger held a shotgun, and he spotted four occupants in the vehicle, who he claimed were T.L.F. members.

An officer responded within seven minutes of Kincaid's 911 call, obtained some details from Kincaid, who now claimed only two people were in the vehicle and that Valdez, whom Kincaid knew, was the driver. The officer then departed when he was dispatched to help another officer pursuing Valdez's vehicle. The pursuing officer stopped the vehicle, occupied only by Valdez and Quinones, and found gunpowder on both hands of both men. The bystander who observed Valdez and Quinones in the fast food restaurant parking lot identified them in a curbside lineup.

Kincaid had suggested in the 911 call that he had a restraining order against his former girlfriend, who was Valdez's sister. But in a later police interview, Kincaid admitted *he* was the one who had been arrested in a domestic disturbance for harassing Valdez's mother.

Following the jury's verdict, the trial court sentenced Valdez to a total term of 46 years in state prison, consisting of a seven-year term for attempting to murder Kincaid, with an additional 10 years for the gang enhancement, and 20 years for a firearm enhancement, plus a two-year four-month consecutive term for the attempt on Villa's life in the first shooting, with an additional six years eight months for a firearm enhancement. Valdez now appeals.

II

DISCUSSION

A.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

D. *MySpace Page*

Valdez contends the trial court erroneously admitted pages from his MySpace social networking site that included his gang moniker ("Yums"), a photograph of him making a gang hand signal, and written notations including "T.L.F.," "YUM $YUM," "T.L.F.'s '63 Impala," "T.L.F., The Most Wanted Krew by the Cops and Ladiez," and "Yums. You Don't Wanna F wit[h] this Guy." (Capitalization modified to initial capital letters only.) The MySpace page included the following under "Groups": "CO 2006, Thug

---

* See footnote, *ante*, page 1429.

Life/Club Bounce." "O.C.'s Most Wanted G's." "Viva Los Jews." "Screaming Thug Life" and, in an interests section, stated: "Mob[b]ing the streets and hustling, chilling with homies, and spending time with my mom." (Capitalization altered.) The prosecution's gang expert, Castillo, explained that in gang parlance, the letter "G" in "O.C.'s Most Wanted G's" stood for "gangster."

An investigator from the district attorney's office, Kevin Ruiz, testified he printed out the Web pages in May 2006, a year *before* the shootings, after accessing them as part of his Internet search using the terms "T.L.F. Santa Ana." He explained that a person's MySpace pages are accessible publicly without a password, but only the person who has created that MySpace profile, or a person who has a password for the page, may upload content to it or manipulate images on it. Ruiz explained, "[W]ithout having the password that belongs to the creator of that website, you can only view what's there . . . ." In other words, "to actually add or subtract anything, you would need the . . . password that was given by the person who created the website . . . ." Ruiz admitted he did not know who uploaded the photographs or messages on Valdez's page, who created the page, or how many people had a password to post content on the page.

The trial court admitted the MySpace printouts for specified purposes and not for the truth of any express or implied assertions. In particular, the court instructed the jury to consider the MySpace evidence for the limited purposes (1) of corroborating a victim's statement to investigators shortly after the first shooting that the victim recognized Valdez from the MySpace site and (2) as foundation for Castillo's expert testimony. Castillo relied on the MySpace page and other evidence as a basis for his opinion Valdez was an active T.L.F. gang member. Valdez objected to admission of the MySpace evidence based on lack of authentication, hearsay, and that it was more prejudicial than probative under Evidence Code section 352,[2] and he renews those challenges on appeal. As we explain, they are without merit.

1. *Authentication*

 Valdez's authentication challenge fails because the prosecution met its initial burden to support its claim the MySpace site belonged to Valdez, and that the photographs and other content at the page were not falsified, but accurately depicted what they purported to show. Importantly, "the fact that the judge permits [a] writing to be admitted in evidence does not necessarily establish the authenticity of the writing; all that the judge has determined is

---

[2] For ease of reference, all undesignated statutory references in this part of the opinion are to the Evidence Code.

that there has been a sufficient showing of the authenticity of the writing to permit the trier of fact to find that it is authentic." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1400, p. 440.) Thus, while all writings must be authenticated before they are received into evidence (§ 1401), the proponent's burden of producing evidence to show authenticity (§ 1400) is met "when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321 [94 Cal.Rptr.3d 198].) The author's testimony is not required to authenticate a document (§ 1411); instead, its authenticity may be established by the contents of the writing (§ 1421) or by other means (§ 1410 [no restriction on "the means by which a writing may be authenticated"]). "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]" (*Jazayeri*, at p. 321.) " '[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence. . . .' " (*Chaplin v. Sullivan* (1945) 67 Cal.App.2d 728, 734 [155 P.2d 368].)

Here, Valdez does not dispute that the MySpace page icon identifying the owner of the page displayed a photograph of Valdez's face. Other indicia the page was his included greetings addressed to him by name ("Hey, Vince") and by relation ("Hey, big brother") in a section of the page where other MySpace users could post comments. In particular, Valdez does not dispute his sister left the "big brother" salutation on his MySpace page, accompanied by a user icon consisting of her photograph and the perhaps facetious label, "Mrs. Kincaid" (she was dating the eventual shooting victim, Jonathan Kincaid, at the time). The greeting from Valdez's sister was one of many posts by friends and by the page owner that included personal details; for example, the post by "Mrs. Kincaid" stated in full: "Hey, big brother, I kinda miss you around the house. Love ya. Bye. Congrats on the job." Additionally, the page owner's stated interests, including an interest in gangs generally and in T.L.F. specifically, matched what the police otherwise knew of Valdez's interests from their field contacts with him. This suggested the page belonged to Valdez rather than someone else by the same name, who happened to look just like him. Although Valdez was free to argue otherwise to the jury, a reasonable trier of fact could conclude from the posting of personal photographs, communications, and other details that the MySpace page belonged to him. Accordingly, the trial court did not err in admitting the page for the jury to determine whether he authored it. (See Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code, *supra*, foll. § 1400, p. 440 [trier of fact "may find that the writing is not authentic despite the fact that the judge has determined that it was 'authenticated' "].)

Similarly, the trial court could conclude that particular items on the page, including a photograph of Valdez forming a gang signal with his right hand, met the threshold required for the jury to determine their authenticity. The contents of a document may authenticate it. (§ 1421.) Valdez does not dispute he is the person depicted in the gang signal photograph. Other "content" in the photograph, specifically, the deliberately posed position of Valdez's hands, was precise and definite to suggest an intentional rather than inadvertent or accidental hand gesture. Nothing on the rest of the page undermined an initial impression the photograph accurately depicted Valdez making a gang hand sign instead of some other signal or motion. Rather, the writings on the page and the photograph corroborated each other by showing a pervading interest in gang matters, rather than an anomalous gesture. Importantly, this consistent, mutually reinforcing content on the page helped authenticate the photograph and writings, with no evidence of incongruous elements to suggest planted or false material. Other key factors include that the evidence strongly suggested the page was Valdez's personal site, as discussed above, and that the page was password protected for posting and deleting content, which tended to suggest Valdez, as the owner of the page, controlled the posted material.

Valdez's reliance on *People v. Beckley* (2010) 185 Cal.App.4th 509 [110 Cal.Rptr.3d 362] is misplaced. In finding the authentication of a Web site photograph there insufficient, the court repeated an observation that " '[a]nyone can put anything on the Internet. No web-site is monitored for accuracy and *nothing* contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can[not] adulterate the content of *any* web-site from *any* location at any time.' " (*Id.* at pp. 515–516, original italics, quoting *St. Clair v. Johnny's Oyster & Shrimp, Inc.* (S.D. Tex. 1999) 76 F.Supp.2d 773, 775.) Here, in contrast, evidence of the password requirement for posting and deleting content distinguishes *Beckley*, as does the pervasive consistency of the content of the page, filled with personal photographs, communications, and other details tending together to identify and show owner-management of a page devoted to gang-related interests. (Cf. *Beckley*, at p. 515 [lone photo at issue there was on the defendant's girlfriend's MySpace Web page, showing *her* making a gang sign].)

■ And unlike other authority on which Valdez relies, nothing suggested he had a personal enemy with a motive to implicate Valdez in future gang crimes by creating an entire site or individual postings on it. (See *U.S. v. Jackson* (7th Cir. 2000) 208 F.3d 633, 638.) Ruiz's downloading of the page contents long predated any conceivable motive in *anyone* to hack or fabricate a MySpace page or its content to implicate Valdez in the shooting crimes here, which occurred a year later. We recognize, of course, that hacking may occur and that documents and other material on the Internet may not be what

they seem. But the proponent's threshold authentication burden for admissibility is *not* to establish validity or negate falsity in a categorical fashion, but rather to make a showing on which the trier of fact reasonably could conclude the proffered writing is authentic. The prosecution met that burden here, as the trial court properly concluded. We therefore reject Valdez's authentication challenge.

### 2. *Hearsay and Evidence Code Section 352*

■ Valdez's hearsay challenge is without merit because the trial court did not admit the MySpace material for the truth of any assertion on the page. Valdez contends the trial court's limiting instruction on this score was "the essence of sophistry" because no "instruction or admonition to a jury to limit its consideration of highly prejudicial evidence to its limited relevant purpose can have any realistic effect." (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130 [128 Cal.Rptr. 302].) But our jury system rests on the assumption jurors are intelligent and capable persons, and we therefore presume the jury adhered to the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Cruz* (2001) 93 Cal.App.4th 69, 73 [113 Cal.Rptr.2d 86] [court must presume the jury " 'meticulously followed the instructions given' "].) Moreover, the MySpace page lacked any improper "electric effect" that might suggest the jury disobeyed the court's instructions. (*People v. Brophy* (1954) 122 Cal.App.2d 638, 652 [265 P.2d 593] [prosecutor produced in closing argument a missing bullet never admitted in evidence; instruction inadequate to cure prosecutorial misconduct]; see *People v. Allen* (1978) 77 Cal.App.3d 924, 935 [144 Cal.Rptr. 6] ["It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' "].) Far from an improper subject matter, gang evidence was central to the case to explain a motive for the driveby shootings, both to inflict damage on other gangs and to enhance a gang's reputation for violence in seemingly random strikes.

In any event, Valdez's hearsay objection fails because the nature of the evidence here did not consist of declarative assertions to be assessed as truthful or untruthful, but rather circumstantial evidence of Valdez's active gang involvement. For example, a reasonable jury would understand its purpose was not to determine whether Valdez and his "Krew" were truly "Most Wanted" by the "Ladiez" in Orange County. Rather, as instructed, the jury was to consider the evidence in deciding what weight to give Castillo's opinion testimony.

■ Valdez insists admission of mere "gang braggadocio" from his MySpace page was more prejudicial than probative, but the fact probative

evidence reflects negatively on a defendant is not grounds for its exclusion. (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189] [under § 352, prejudicial is not synonymous with damaging].) In hindsight, Valdez suggests alternative, more selective admission of the MySpace evidence would have been prudent, such as only a photograph identifying him by his "Yums" moniker, "without the inflammatory gang-related writing." But he made no such suggestion below (*People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765] [trial court does not "err[] in failing to conduct an analysis it was not asked to conduct"]) and, as discussed, the gang evidence was relevant and probative. There was no error.

E. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

### DISPOSITION

The true finding on the gang enhancement alleged in count eight for the attempted murder of Kincaid is reversed. The judgment is affirmed in all other respects.

Bedsworth, Acting P. J., and Moore, J., concurred.

The petitions of both appellant and respondent for review by the Supreme Court were denied March 28, 2012, S199558.

---

*See footnote, *ante*, page 1429.