Filed 11/6/25  In re D.C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | G063528 |
| Plaintiff and Respondent, | (Super. Ct. No. 23DL1466) |
| v. | O P I N I O N |
| D.C., | |
| Defendant and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Isabel Apkarian, Judge. Affirmed.

Larenda R. Delaini, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

D.C. appeals from the juvenile court's jurisdiction and disposition orders (Welf. & Inst. Code, §§ 702, 706) based on findings he was a minor in possession of a handgun (Pen. Code, § 29610, subd. (a)).[1] He contends surveillance video evidence was wrongly admitted because it lacked foundation and authentication. While that is a close issue, we conclude any error was harmless. We also find unpersuasive D.C.'s contention that gang-related evidence was wrongly admitted. We affirm.

FACTS

I.

THE INVESTIGATION

On October 7, 2023, gunshots were reported fired "at 1:00 in the morning," on the "700 block of Shalimar." Ten hours later, a Costa Mesa police officer investigated the scene and "spoke with the reporting party who had called [him]."

A Costa Mesa gang investigator "assisted . . . with looking through" a system of "cameras" and "file[s]" called "an Automated License Plate Reader that was installed through the city" and "use[d] to assist in investigations." The system allowed the investigator to log in for "specific cameras [to] check for vehicles that [were] reported stolen or . . . would pass in front of [them,] . . . collect[ing] . . . license plate" information. He identified "a black Honda in the area of Wallace and Shalimar on October 7 around 1:00 A.M."

The investigator spoke with the vehicle's owner and obtained a search warrant for the cell phone of the owner's son. Stored in the phone, the investigator found two video recordings and several pictures.

---

[1] All undesignated statutory references are to the Penal Code.

The first cell phone video "starts off with . . . [a] person in [a moving vehicle's] front passenger seat looking towards their lap holding a handgun with a slidelock to the rear. . . . Then the person taking the video looks to their left and shows the driver," who the investigator recognized to be D.C. The investigator recognized the "slide . . . and the barrel" as "appear[ing] to be . . . similar [to that] of a Gen Glock 19." In another cell phone video, the investigator recognized a "hand tattoo" of D.C., who "appear[ed] to be grabbing a handgun . . . while making [a] hand sign" showing he belonged to a "criminal street gang[]." In both videos, D.C. was wearing the same "navy blue hoodie with white lettering on the front . . . , a white undershirt, and black pants."

A cell phone picture had a date and time stamp of October 7 at 1:03 a.m. and showed "someone standing in front of a posted sign" identifying the 700 block of Shalimar Drive. Even though the person was wearing a facemask, the investigator believed the individual was D.C. "holding a black handgun in [his] right hand . . . wearing a navy blue hoodie with" the same "white lettering" and shoes "consistent with the observations . . . made of [D.C.] in [the cell] phone." The investigator was "certain" two other photographs showed D.C. "holding a firearm." D.C. was standing in the "same stance" as in one of the other cell phone pictures and was "holding the firearm in the right hand." The picture's "time stamp . . . [was] October 7th . . . 14 minutes after midnight." Another picture showed D.C. wearing the same clothing and "pointing a firearm at the camera."

## II.

### THE JUVENILE COURT PROCEEDINGS

The district attorney filed a petition (Welf. & Inst. Code, § 602) alleging D.C. had been a minor in possession of a handgun (§ 29610, subd. (a)).

At the jurisdiction hearing, the officer testified about obtaining two surveillance videos—these are different from the license plate reader and cell phone videos already discussed. They are not in our record.

First, the prosecutor asked "[A]t some point, were you able to find surveillance that captured the area of [the shots fired] at that date and time?" The court sustained D.C.'s foundation objection, but allowed the prosecutor to rephrase: "Did you locate surveillance showing the area of [the shots fired] from October 7th at approximately 1:13 in the morning? [¶] [D.C.'s counsel]: Objection; foundation as to time, calls for expert testimony. [¶] [The court]: Overruled." The officer answered, "Yes."

The prosecutor played the first surveillance video for the court. D.C. objected again, asserting insufficient authentication, foundation, and proof of chain of custody. Overruling, the court explained: "I don't believe the video is being entered into evidence yet. I'm waiting to see if the [prosecutor] can lay the proper foundation."[2] The officer identified the area recorded as "the 700 block of Shalimar Drive." The officer testified, over objections, that it contained a "date and time stamp" of "October 7th, 2023. [¶] . . . [¶] . . . [a]t, approximately, 0113 hours." D.C.'s counsel later renewed a foundation objection: "The officer testified that he was not there at 1:07 A.M.; as such, he

_____

[2] We commend the trial court for its patience with a series of premature objections.

4

cannot testify via personal knowledge that this is a clear and accurate depiction of what this environment looked like at that alleged time." The court overruled it. The officer then testified that in the video he saw three males leave and return quickly to a parked car: "It seems like something happened, and the two males then immediately start running back to the vehicle. You see the third male run back to the vehicle."

Next, the prosecutor asked the officer about a second surveillance video. "Q. Did you eventually locate another surveillance video? [¶] A. Yes. [¶] . . . [¶] Q. Did you recover surveillance video from another source showing that same vehicle around the same date and time?" D.C. objected on the grounds of speculation, lack of personal knowledge, and lack of foundation and was overruled. The officer responded "Yes," and testified the video showed "a Honda parked westbound similar to this [*sic*] video, and you see a male walking eastbound. You see what appears to be some kind of -- how do I say it -- muzzle fire coming out of an item, then you hear, approximately, six gunshots." The officer then saw "the males running towards the vehicle that was parked."

The officer testified about his training and experience with gangs, including those active in the area of the shooting. The assisting investigator opined about sharing "photos and videos" from cell phones in gang culture, to "boast." He also testified about "ghost gun[s]" used as a "slang term" and the gang signal he believed D.C. showed with his hand, in the second cell phone video.

When the evidence closed, D.C. renewed his objections to the videos and pictures. The court overruled them without explicit findings.

The court found true that D.C. had been a minor in possession of a handgun. (§ 29610, subd. (a).) Regarding the weapon, the court explained "that, perhaps, any one of these pieces of evidence on their own wouldn't be enough, [but] it's when you look at all of it together that the court is seeing the link between the allegation. It's not simply a photograph of what appears to be [D.C.] holding a gun and that is it; . . . we have to worry about, 'Is this a real gun?' [¶] And when I look to the call for the shots fired, the sound of what appears to be a real gun compared to the jury instruction that says, 'Look at reasonable interpretations,' we heard about cross-examination over replica guns, imitation firearms, items that are used on movie sets that are not capable of being fired, M-80s, fireworks. None of that is reasonable given the totality of the circumstances. [¶] It is not reasonable that the gun possessed in the early hours of October 7 was not an actual firearm. I don't find the purported other interpretations of the evidence to be reasonable; therefore, the Court is convinced, beyond a reasonable doubt, that the black item that looked like a firearm in the photographs and videos is, in fact, a firearm." The court ordered D.C. to serve 180 days in a juvenile institution.

DISCUSSION

I.

ANY ERROR IN ADMITTING THE SURVEILLANCE VIDEOS WAS HARMLESS

*A. Admissibility Is a Close Call*

D.C. argues "[t]he surveillance videos should have been excluded because [the officer's] testimony neither proved that the videos were authentic nor established the necessary foundation."[3] The Attorney General

---

[3] D.C. does not challenge the license plate identification nor the cell phone evidence.

counters the court's admissibility rulings passed muster under the deferential abuse of discretion standard of review, as applied in *People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*) and *In re K.B.* (2015) 238 Cal.App.4th 989, 997–998.

This is a close call. On one hand, there was some evidence to make a "prima facie case" of authentication. (*Goldsmith, supra,* 59 Cal.4th at p. 267.) The officer confirmed the videos generally represented the 700 block of Shalimar. Though he could not confirm the surveillance videos accurately represented that area at the time of the shooting, they apparently had date and time stamps. We cannot confirm because the videos are not in the record.

But because the People failed to offer evidence to show the origin of either surveillance video, D.C. may have the better argument about whether the videos were what they purported to be—depictions of where the shots were fired *when they were fired*. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434–1435 [proponent's burden].)

Neither of the Attorney General's two cited cases are especially helpful here.

First, the Attorney General correctly notes that in *Goldsmith*, statutory presumptions helped "supply the foundation for admission of" video and pictures showing a traffic light violation. (*Goldsmith, supra,* 59 Cal.4th at pp. 267, 268.) But he does not acknowledge the "statutes' presumptions *partly, but not completely*, suppl[ied] the foundation for admission of [the] evidence." (*Goldsmith, supra*, 59 Cal.4th at pp. 267–268, italics added; *id.* at

7

p. 271 ["presumptions . . . d[id] not in themselves fully supply the necessary foundation"].)[4]

Goldsmith provides a two-step analysis. First, the statutory presumption shows the "'print function . . . worked properly'"—the printed exhibit offered in court is an accurate representation of whatever was on a computer, video, or digital medium. (*Goldsmith, supra*, 59 Cal.4th at p. 269.) Second, something else besides the presumption is needed to show the computer, video, or digital medium accurately captured the information. (*Id.* at p. 271.) That could be testimony from a witness who saw an event and believes a photo of it is accurate. (*Id.* at p. 268.) It could be testimony from someone who took the picture (*ibid.*) or who knows how the camera that captured the information works (*id.* at p. 271). It could even be "supplied by . . . circumstantial evidence, content and location." (*Id.* at p. 268.)

In *Goldsmith*, the something extra was the testimony of a witness who confirmed the photographs came from specific equipment and explained the "operation of the . . . camera system" that had created the photographs. (*Goldsmith, supra*, 59 Cal.4th at p. 271.) The photographs' contents also served as "circumstantial evidence" showing "the system was working properly." (*Id.* at p. 271, fn. 7.)

[4] Evidence Code section 1553, subdivision (a) provides: "A printed representation of images stored on a video or digital medium is presumed to be an accurate representation of the images it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of images stored on a video or digital medium is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the images that it purports to represent."

Our record is short on the kind of foundation required by *Goldsmith*. No one testified about whether either surveillance video was an accurate representation of the scene at the time of the gunshots. No one testified they took the videos. No one explained how the camera system worked—we don't know what cameras took the videos. We don't have the videos so we can't rely on their content as circumstantial evidence. The officer only confirmed without elaboration that he "locate[d]," "collected," "recovered," "retrieved," and "c[a]me to be in possession" of the videos.

Second, *In re K.B.* is also inapt because trial witnesses laid the foundation for Instagram photos. A trial witness "explained [that] Instagram is a Web-based photograph sharing platform through which users share[d] user-generated content." (*In re K.B., supra*, 238 Cal.App.4th at pp. 992, 998.) Another witness explained how he "extract[ed] images" from a suspect's cell phone. (*Id.* at pp. 993, 997.) We lack such testimony here.

## B. Any Error Was Harmless

Even assuming the surveillance videos lacked sufficient foundation, D.C. does not show a reasonable probability he would have achieved a more favorable outcome had the videos been excluded. (*People v. Valencia* (2021) 11 Cal.5th 818, 840.) While the second surveillance video was the only direct evidence of gunshot noises, "as a matter of law" the "inability to say *conclusively* that the gun was real . . . does *not* create a reasonable doubt." (See *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1437, italics added (*Monjaras*).)

Here, there was sufficient circumstantial evidence of an actual handgun. (See *Monjaras, supra*, 164 Cal.App.4th at pp. 1435–1438 ["Circumstantial evidence alone is sufficient to support a finding that an

9

object used by a robber was a firearm"].) Police officers investigated a report of shots fired at the 700 block of Shalimar Drive around 1:00 a.m. The officers identified a black Honda in that area at that late hour. The son of that car's owner had a cell phone with videos and pictures showing D.C. holding a handgun.[5] Even without the second surveillance video capturing the sound of gunshots, we would still agree with the juvenile court that "[i]t is not reasonable that the gun possessed in the early hours of October 7 was not an actual firearm. [We] don't find the purported other interpretations of the evidence to be reasonable."

## II.

### GANG EVIDENCE WAS CORRECTLY ADMITTED

Finally, we reject D.C.'s contention that wrongly admitted "irrelevant gang evidence was likely used" by the trier of fact to improperly infer that "since [D.C. was] a gang member, and gang members possess firearms to intimidate rival gang members and boost their credibility within the gang, [D.C.] must have possessed a real firearm . . . when he drove into rival gang territory."[6]

D.C.'s reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214, is unhelpful. First, the gang evidence at issue here was highly probative of motive and intent and not "extremely inflammatory" like the evidence in *Albarran*. (*Id.* at p. 227; see *id.* at pp. 223–224 [gang evidence relevant to motive and intent].) In contrast to the cell phone pictures here, in *Albarran* there was "no evidence presented that any gang members had 'bragged' about their involvement" in a shooting. (*Id.* at p. 227.) Second, this case was tried to

_____

[5] The cell phone pictures are in the record but not the cell phone videos. We rely on the officer's testimony about these videos.

an experienced judge, not a jury as in *Albarran*. (See *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 22 ["we are mindful that this case does not involve a jury, but rather a bench trial in which the trier of fact was a judge capable of weighing the evidence without being influenced by its inflammatory nature"].)

DISPOSITION

The order sustaining the petition and the dispositional order are affirmed.


SCOTT, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


DELANEY, J.