Filed 5/26/26  P. v. Rangel CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064683 |
| v. | (Super. Ct. No. 23CF0137) |
| XAVIER ZACKARY RANGEL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge. Reversed and remanded.

Michael Ian Garey, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Assistant Attorney General, A. Natasha Cortina and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Xavier Zackary Rangel appeals from his convictions for torture and kidnapping. He asserts an inmate-created document known as a "roll call"—essentially, a list of inmates who were members of a jail "social group"—should have been excluded as hearsay. We agree with Rangel the exhibit was implied hearsay offered to prove the truth of what it implicitly asserted—that Rangel was a member of the social group. Because the roll call was the only evidence directly tying Rangel to the social group that carried out the crimes, there is a reasonable probability he would have obtained a more favorable result had the exhibit been excluded. We reverse and remand.

FACTS

The victim in this matter was housed in a unit known as "tank 6" in the central jail. The victim was told by a fellow inmate about "rules" for the tank but purportedly did not comply.

The victim subsequently suffered multiple beatings by multiple inmates, after being dragged to different locations—from the bunk beds to the showers to the "day room." The beatings resulted in substantial injuries like broken ribs and spinal fractures. The chain of events, which lasted over 40 minutes, was captured on video (no audio) through multiple jail cameras.

It is undisputed Rangel never put his hands on the victim. But in the minutes preceding the beatings, Rangel did speak to the victim, point at the victim's bunk, and, after looking down to tank 5, wave someone over towards the bunk where the victim was sitting. That person then looked down to tank 5 for about 12 seconds, walked over to the victim, and kicked the victim in the face.

Rangel was charged with torture and kidnapping. (Pen. Code, §§ 206 & 207.)[1] The prosecutor asserted three theories of liability: (1) "direct aiding and abetting," (2) "natural and probable consequences . . . of aiding and abetting" assault with the intent to inflict great bodily injury, and (3) an uncharged conspiracy to "commit torture, kidnapping, and/or assault with force likely to produce great bodily injury."

At an Evidence Code section 402 hearing, the court considered the admissibility of documents known in jail culture as "kites"—i.e., handwritten notes—found in different inmate cells.

The first set of kites was found in the cell of an inmate housed in tank 5. One had written on it "'I have been llaves,'" which an expert witness explained at trial meant "keys," signifying "control over [a] specific location." The other kite was identified as a "roll call," which the expert explained to the jury "list[s] the inmates who are in good standing and participating in the program of the car," which is another name for a social group. It did not contain Rangel's name, but did include the name of a tank-5 codefendant.

The other set of kites was found by a Theo Lacy jail employee who searched the cell of two inmates an expert later identified as "at the height of" the social group's "hierarchy." The employee "retrieved the papers from the toilet" after witnessing one inmate "ripping up a bunch of papers and tossing them into the toilet" and the other "trying to block the door" visually. One of the kites was a roll call containing Rangel's name and booking number, "Xavier Rangel #3252464 [redaction] C 1/27/23."

Rangel's counsel objected to the admission of the roll call on the grounds of foundation, hearsay, and confrontation. The prosecutor asserted

---

[1] All undesignated statutory references are to this code.

3

the roll call was nonhearsay: "The fact that the name is on the list has independent significance [¶] . . . that [a codefendant] is associated with this social group." The prosecutor continued: "The statement I'm admitting is not 'Xavier Rangel is a Paisano.' [¶] If that's what the list said, then I wouldn't be able to admit that, because I'm trying to prove the truth of that statement. [¶] Instead what's different about this is I'm introducing a name. And that name on the list means something different than just the name. [¶] His name on the Paisano list means that he is a member of this social group." The trial court overruled Rangel's objections and admitted the roll call as exhibit 50.

During opening statements, the prosecutor asserted the videos would show Rangel "getting his orders from [tank 5] downstairs." The prosecutor's theme was that Rangel was part of the social group—or "car"—responsible for beating the victim. The prosecution's expert later explained that certain "lower level" members of the offending group were called "Paisano[s]" and those with more authority were sometimes called "reps."

The expert also read Rangel's name from exhibit 50 to the jury. While the expert never specifically opined that Rangel was a "rep," the prosecutor asserted during closing statements that Rangel was one of tank 6's reps, along with the inmate who had provided the "rules" to the victim prior to his beatings.

DISCUSSION

We agree with Rangel that the trial court wrongly admitted the exhibit 50 roll call because it is implied hearsay.[2] "'[E]vidence of an express statement of a declarant is . . . hearsay evidence if such evidence is offered to prove—not the truth of the matter that is stated in such statement

---

[2] We need not reach Rangel's claim the kites were unauthenticated. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429.)

4

expressly—but the truth of a matter that is stated in such statement by implication.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289 (*Garcia*).) "'An implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant *in fact intended* to make such implied statement, or (2) that a recipient of declarant's express statement would *reasonably believe* that declarant intended by his express statement to make the implied statement.'" (*Ibid.*) Exhibit 50 contains Rangel's name and booking number and does <u>not</u> expressly state he is a member of the social group.

But by implication, including Rangel's name and number on a roll call—a list of "inmates who are in good standing and participating in the program of the car"—impliedly asserts Rangel is a member. The way the expert described the purpose of roll calls, whoever included Rangel on this roll call intended to identify Rangel as a member and any recipient would have understood that. The prosecutor essentially concedes the roll call is offered for the truth of this implied statement: "If that's what the list said[, i.e., "'Xavier Rangel is a Paisano'"], then I wouldn't be able to admit that, because I'm trying to prove the truth of that statement."

The Attorney General's defense of exhibit 50 as nonhearsay is tepid. The respondent's brief's entire argument on this point reads: "Appellant's name and booking number on the kites were not admitted for the truth of their contents. Rather, they were admitted as circumstantial evidence of appellant's participation in the . . . social group." It does not address Rangel's hearsay contention, attempt to distinguish *Garcia*, or cite any supporting authority.

We disagree exhibit 50 was offered as circumstantial evidence as the Attorney General contends. It is not ""capable of serving its nonhearsay

5

purpose regardless of whether the jury believes the matters asserted to be true.""" (*Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447.) It is not akin to a receipt or fishing license that, by its mere presence in a particular location, tends to show someone's association with that location. (See *id.*, at pp. 448–449 [case law """applying the not-for-the-truth limitation""].) Exhibit 50 was found in the cell of *others* who had no demonstrated tie to Rangel other than through the truth asserted by the exhibit itself.

Because exhibit 50 was inadmissible hearsay, the expert committed *Sanchez* error when he recounted its contents to the jury. (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*).) Rangel's name and booking number were case-specific hearsay.[3]

The state law prejudice standard applies because exhibit 50 was not testimonial. (*People v. Valencia* (2021) 11 Cal.5th 818, 840 (*Valencia*); *People v. Watson* (1956) 46 Cal.2d 818, 836–837.) The undisputed circumstances show exhibit 50 was not "made 'with a primary purpose of creating an out-of-court substitute for trial testimony.'" (*Sanchez, supra*, 63 Cal.4th at p. 688.) Exhibit 50 was made for jail social group purposes, ripped up, and tossed in a jail toilet.

Rangel shows "'it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error.'" (*Valencia, supra*, 11 Cal.5th at p. 840.) Not only was exhibit 50 the only document that showed his name or booking number on a roll call, it was the

---

[3] On the other hand, we do not hold the expert's testimony was so "[i]nextricably intertwined" with hearsay, as Rangel contends, that all of the expert's opinions rest on an "insufficient basis."

only direct evidence of Rangel's membership in the "social group" at the center of the prosecution's trial theme.[4]

We reject the Attorney General's theory that "any inadmissible hearsay relayed by the expert paled in comparison to the more compelling nonhearsay . . . jail surveillance video[s]." The video evidence shows Rangel making ambiguous gestures in a crowd of onlookers that may or may not have played a role in the attack. We do not find the videos to be quite as clear-cut as the Attorney General claims. For example, one of the videos is described in the respondent's brief as depicting an inmate that Rangel "recruited to participate in the shower assault." The record citations are to (1) a video that spotlighted Rangel's codefendant's actions and (2) the testimony of the deputy who first responded to the beatings. Though the video does depict Rangel at certain points, a doorway obstructs the view of his movement nearest to the cited timeframe. More problematically, the cited portion of the reporter's transcript is the deputy's testimony identifying the claimed recruit with no mention of his relationship to Rangel.

As the Attorney General notes in a different context, the videos were presented "against the backdrop of the organization, rules, and structure of the jail's . . . 'social group,'" which "demonstrated [Rangel] held a position of authority among the . . . inmates in tank six and helped orchestrate the crimes." To understand Rangel's gestures as the prosecution

---

[4] We need not consider any *Sanchez* error when the expert confirmed in front of the jury that a different kite "is . . . a roll call." That roll call did not name Rangel, but did name his tank-5 codefendant.

suggested, the jury likely looked to other evidence tying Rangel to the social group—most notably, exhibit 50.[5]

DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings.


SCOTT, J.

WE CONCUR:


DELANEY, ACTING P. J.


GOODING, J.

---

[5] We do not reach Rangel's other appellate challenges: (1) the prosecutor erred in opening statements by asserting what Rangel "was going to say" at trial (see *People v. Jasso* (2025) 17 Cal.5th 646, 698 [forfeiture of *Griffin* error claim]); (2) the jury instruction on natural and probable consequences violated Rangel's right to notice of his charges; and (3) the evidence was insufficient to support the convictions.