Filed 2/26/14  P. v. Blanchette CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047393 |
| v. | (Super. Ct. No. 11HF1498) |
| IAN JON BLANCHETTE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Reversed in part and affirmed in part.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant, Ian Jon Blanchette.

Richard Glen Boire, under appointment by the Court of Appeal, for Defendant and Appellant, Alberto Jose Robiatti.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Ian Jon Blanchette and Alberto Jose Robiatti appeal from judgments after a jury convicted them of firearm and criminal street gang offenses and found true street gang enhancements. Robiatti argues the trial court erred in admitting evidence, insufficient evidence supports his conviction for street terrorism and the jury's findings he committed the firearm offenses for the benefit of a criminal street gang, and he received ineffective assistance of counsel. Blanchette also argues insufficient evidence supports the jury's finding he committed the firearm offenses for the benefit of a criminal street gang and he joins in Robiatti's arguments to the extent they accrue to his benefit.

As we explain below, we conclude insufficient evidence supports Robiatti's conviction for street terrorism, a point the Attorney General concedes. None of their other contentions have merit. We reverse in part and affirm in part.

FACTS

At about 5:00 p.m. on June 14, 2011, Sheriff Mark Peters of the Orange County Sheriff gang enforcement team and other team members were on a stakeout of Blanchette's residence in San Clemente. Over the course of two hours, Peters observed Blanchette and Robiatti, alone and together, come outside, smoke, and go back inside. Peters did not see either man holding anything. During that time a man later identified as Trey Cathey arrived in a BMW and went inside without anything in his hands. A little later, Peters saw Blanchette and Robiatti leave the house and get into a Toyota Prius. Neither man was carrying anything, and their clothes did not appear to be bulky. Blanchette drove and Robiatti sat in the front passenger seat. Peters notified nearby officers they were leaving.

Sheriff Theodore Wilder conducted the traffic stop .2 miles from Blanchette's home. Wilder approached the car and saw Blanchette holding a cellular telephone. After Wilder told Blanchette to put down the cell phone, Blanchette gave Wilder his driver's license and said the car belonged to his wife. Wilder ordered the men

2

to get out of the car, and he searched the car. Underneath the front passenger seat where Robiatti had been sitting, Wilder found a loaded black Ruger nine millimeter semi-automatic handgun wrapped in a grey bandana. Wilder found an identical bandana in Robiatti's pocket. The handgun's serial number had been removed.

Deputy sheriff Don Monteleone took the keys from the car and met deputy sheriff Ashraf Abdelmuti and another deputy sheriff at Blanchette's house. They found Cathey sitting alone in the living room, and after speaking with him, they let him leave. One of the keys from the car matched Blanchette's front door. Sheriffs searched the house[1] and found the following:

1. In an entertainment center in the living room, an envelope addressed to "Myra and Ian" and a green notebook with "66" and "FF" written on it.

2. In an ottoman in the living room, a plastic bag containing nine millimeter bullets compatible with the gun found in the Prius.

3. In a bedroom, deputy sheriffs found the following:

a. On the bed, two gun cases with the name "Ed Duron" written on them. One of the cases held a Mossberg 12-gauge shotgun and the other held a Savage Arms 12-gauge shotgun; neither gun was loaded.

b. Under the bed, a black canvas guitar bag with another Mossberg 12-gauge shotgun and a Winchester 30-30 lever rifle, and a green case with a Colt .45 caliber pistol; none of the guns were loaded.

c. On a table, an April 2011 earnings statement for Blanchette addressed to the residence.

4. In the kitchen, a notice to pay rent or quit issued to "Myra Loeza" and "Ian Blanchette."

---

[1] The parties stipulated the searches of the Toyota Prius and Blanchette's home were lawful.

3

Abdelmuti tried to search the cell phone Blanchette was holding, but the battery was dead. After Abdelmuti charged the cell phone, he discovered the cell phone was password protected. Later, Monteleone removed the memory card from the cell phone and inserted it into his computer. He found six photographs that were date stamped, "20110614" and time stamped between 14:15 hours and 14:18 hours. Four of the photographs showed a person, whose face was not visible, holding guns. The person in the photograph had tattoos that matched Robiatti's tattoos. The guns the person was holding matched the guns found in Blanchette's bedroom. The background in the photographs matched Blanchette's bedroom.

An amended information charged Blanchette and Robiatti with the following: felon carrying a loaded firearm in public (Ruger nine millimeter semi-automatic handgun) (Pen. Code, § 12031, subd. (a)(1), (a)(2)(A))[2] (count 1); possession of a firearm by a felon (Mossberg 12-gauge shotgun in tan canvas bag) (§ 12021, subd. (a)(1)) (count 2); possession of a firearm by a felon (Savage Arms 12-gauge shotgun) (§ 12021, subd. (a)(1)) (count 3); possession of a firearm by a felon (Colt .45 caliber pistol) (§ 12021, subd. (a)(1)) (count 4); possession of a firearm by a felon (Mossberg 12-gauge shotgun in black guitar bag) (§ 12021, subd. (a)(1)) (count 5); possession of a firearm by a felon (Winchester 30-30 lever rifle in black guitar bag) (§ 12021, subd. (a)(1)) (count 6); and misdemeanor possession of firearm with identification numbers removed (§ 12094, subd. (a)) (count 7). The amended information also charged Robiatti with street terrorism (§ 186.22, subd. (a)) (count 8). The amended information alleged they committed counts 1, 2, 3, 4, 5, and 6 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Finally, it also alleged Robiatti suffered six prior prison terms (§ 667.5, subd. (b)).

---

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

4

After Peters testified but before Monteleone took the stand, the trial court addressed the issue of the admissibility of four photographs recovered from the cell phone Blanchette possessed and three gang related photographs recovered from a computer in Blanchette's home. Relying on *People v. Valdez* (2011) 201 Cal.App.4th 1429 (*Valdez*), and *People v. Beckley* (2010) 185 Cal.App.4th 509 (*Beckley*), the trial court ruled the computer photographs were not properly authenticated and were "too unreliable to be admissible even as a basis for an [expert] opinion." But the court also ruled Monteleone could rely on the four photographs from the cell phone in forming his opinion whether the offenses were committed for the benefit of a gang. The court based its ruling on the following: Blanchette possessed the cell phone, the cell phone was accessed, the photographs were recovered, the photographs were date stamped, and the background of the photographs appears to be Blanchette's home. The court indicated defense counsel was free to cross-examine Monteleone on, among other things, the origin of the photographs and what they depicted but that was a question of the weight of the evidence and not the evidence's admissibility as a basis for the expert's opinion. The court reserved ruling on whether it would admit into evidence the four photographs from the cell phone.

At trial, the prosecutor offered the testimony of gang expert, Monteleone. After detailing his background, training, and experience, Monteleone testified concerning the culture and habits of traditional, turf-oriented criminal street gangs, and specifically Varrio Familia Flats (VFF). Monteleone explained the various ways a person can join a gang and how a gang member's level of commitment to the gang is often based on how long he has been in the gang. He opined tattoos are an important part of gang culture because they demonstrate a person's loyalty to the gang. He stated gang members earn respect through committing violent crimes and boast about their crimes to enhance their reputation in the gang and instill fear in the community. He asserted gang members will commit crimes inside and *outside* their territory.

5

Monteleone explained guns are of critical importance to gangs. He stated gang members use guns to commit crimes, assault rival gang members, and provide protection. He said a "gang gun" is a gun that belongs to the gang and that gang members share. Gang members "store the weapon in a place where law enforcement won't look or they believe to be -- where they believe law enforcement doesn't have access." He said gang members who have guns are revered by other gang members, and gang members hide guns for other gang members. He also explained the purpose of STEP notices[3] and field identification cards.[4]

Monteleone testified concerning VFF. He detailed its formation in the 1990's and stated its claimed territory is the entire city of Rancho Santa Margarita. He described the brand of clothing VFF gang members wear (Famous Stars and Straps), its common signs and symbols ("FF," "66," "VFF," "First Locos," and "Familia Flats"), its membership (20-40 total members and 10-20 active members), its rivals (Family Mob and Varrio Viejo San Juan Capistrano), and its allies (Varrio Chico San Clemente and Varrio Chico Orange Avenue). VFF gang members Mauricio DeJesus Padilla and Jaime Manjarrez had, within the requisite time period, committed the crimes necessary to establish the statutorily required predicate offenses. Monteleone testified VFF's primary activities are possession of firearms, assaults with deadly weapons, and vandalism. He opined VFF is a criminal street gang as statutorily defined.

---

[3] Section 186.22, enacted in 1989 and operative in 1993, is part of the California Street Terrorism Enforcement and Prevention Act of 1988, also known as the STEP Act. A STEP notice is a document that advises an individual he is an active participant of a criminal street gang and is subject to enhanced penalties for committing crimes for the benefit of the gang.

[4] A field identification card is a card law enforcement officers complete when they interview an individual. The card includes the individual's contact information, if the individual was with anyone during the contact, an individual's statements, and the individual's clothing.

6

Monteleone testified concerning Robiatti. He stated Robiatti has multiple VFF tattoos, including the following: "'First Locos'" on his forearm; "VFF" on his left hand; "66" and "Rancho Santa Margarita" on his chest; "Flats" on his stomach; "Familia Flats" on his back; and "F" on one of his feet. He has numerous other tattoos, including "O.C." on his right hand and "County of Orange" on his left shoulder. He stated Robiatti had one STEP notice from December 12, 2007, where he was at the home of another VFF gang member and admitted he was associating with VFF. He also said Robiatti had nine field identification cards, the following that were significant: (1) July 2, 1999-Robiatti admitted he had been jumped into VFF in 1997; (2) June 14, 2008-Robiatti admitted he was a VFF gang member; and (3) September 19, 2008-Robiatti was with a known VFF gang member, was wearing VFF's uniform, and admitted he knew VFF was a criminal street gang, his gang moniker was "Speedy," and his tattoos were gang related. Monteleone added Robiatti was associated with 22 police reports, at least four of which were gang related. Based on his review of this case and his knowledge of Robiatti, Monteleone opined Robiatti was an active participant in VFF at the time of the offenses. Monteleone later testified Blanchette was *not* an active member in VFF at the time of the offenses. He also opined Duron was an active member of VFF with the gang moniker "Magic" based on his own personal contacts with him and his investigation of Duron, including discussions with other law enforcement officers and review of police reports, STEP notices, and field identification cards.

Based on a hypothetical question that tracked the evidence, Monteleone opined the offenses were committed in association with and for the benefit of VFF. He explained the offenses would benefit VFF because VFF enhances its reputation in the community by instilling fear, and weapons enable the gang to commit crimes in the community. He added the offenses would enhance the active participant in the gang's reputation because "he has access to weapons[]" and it will "enhance[] [his] reputation of being a violent gang member." He opined the active participant and the car's driver were

7

acting in association with the gang because they were holding weapons that belonged to another VFF gang member. Monteleone stated the driver benefitted VFF because he was driving the active participant in VFF and there was a gun in the car. Additionally, he said the driver was providing "a safe house" for VFF to store its guns.

On cross-examination, Monteleone conceded a gang member can commit a crime for his own personal benefit. He did not know whether any of VFF's rivals were aware of the weapons recovered from Blanchette's home or whether any VFF gang members had used the guns to commit other crimes. Neither Blanchette's home nor the area where officers stopped the car was in VFF territory, but Monteleone stated not all active gang members live in the gang's territory. He did not speak to anyone in the community to learn whether "this incident affected them[.]" Monteleone agreed his conclusions were premised on the fact the gang members knew the guns were present.

The prosecutor also offered testimony concerning the four photographs recovered from the cell phone and the cell phone's chain of custody. Abdelmuti explained Wilder gave him the cell phone and when he was unable to access it, he gave it to Monteleone. Monteleone testified there were six photographs on the memory card. He printed color photographs and returned the cell phone to Abdelmuti who booked it into evidence. He opined the tattoos on the person in the photographs match Robiatti's tattoos. He also said the background in one of the photographs matched Blanchette's bedroom. Abdelmuti explained law enforcement did not request fingerprint or DNA analysis because they had photographs showing Robiatti handled the guns. They did not ascertain the subscriber or the telephone number for the cell phone.

Abdelmuti testified concerning four of the photographs on the cell phone as follows: exhibit No. 21-a person with a tattoo on his right hand between the thumb and index finger sitting in what appears to be Blanchette's bedroom holding a shotgun that resembles the shotgun recovered from Blanchette's bedroom; exhibit No. 23-a person with a tattoo on his upper left shoulder sitting in what appears to be Blanchette's

8

bedroom holding another shotgun that resembles the shotgun recovered from Blanchette's bedroom; exhibit No. 24-a person with a tattoo on his right hand holding a rifle that resembles the rifle recovered from Blanchette's bedroom; and exhibit No. 25-a person with two tattoos (upper left shoulder and forearm) holding a shotgun that resembles the shotgun recovered from Blanchette's bedroom. Abdelmuti and Monteleone both admitted they did not know who took the photographs or when they were taken.

The parties stipulated both Blanchette and Robiatti had been convicted of felony commercial burglary.

At the close of evidence, Robiatti's defense counsel objected to admission of the four photographs recovered from Blanchette's cell phone based on a lack of foundation and authentication. The trial court ruled the photographs were admissible because "there's foundation for the admissibility of those photographs by virtue of sufficient evidence to identify the person who possessed the phones."

During closing argument when discussing the street terrorism enhancement the prosecutor stated: "Okay. And then the second element is the defendant intended to assist, further, or promote criminal conduct by gang members. You can do any of those. You can assist, further, or promote criminal conduct by gang members. [¶] I do not have to prove that the defendant is an active or current member of the gang. As I discussed yesterday, this enhancement applies to non-active participants or non-gang members as long as you meet these elements. [¶] Well, let's talk about . . . Robiatti. Because we know that . . . Robiatti is an active participant of [VFF]. So, believe it or not, he can actually assist, further, or promote his own criminal conduct. It's not like he has to promote somebody other than himself. He's a gang member himself. That was the opinion of . . . [Monteleone]. . . . [¶] . . . [¶] It was . . . Monteleone's opinion that Robiatti was an active participant and gang member, so he can promote. Just by

9

committing the felony, he's promoting himself. Don't think that you have to go out there and find that he has to promote some other person, okay?"

The jury convicted Blanchette and Robiatti of all counts and found true all the allegations. At a bifurcated bench trial, the trial court found true Robiatti suffered six prior prison terms.

The trial court sentenced Blanchette to prison for eight years and four months as follows: the upper term of three years on count 1 and a consecutive lower term of two years for the street terrorism enhancement; and one-third the middle term of eight months on counts 2, 3, 4, 5, and 6 to run consecutively.

The trial court sentenced Robiatti to prison for 16 years and four months as follows: the upper term of three years on count 1 and a consecutive upper term of four years for the street terrorism enhancement; one-third the middle term of eight months on counts 2, 3, 4, 5, and 6 to run consecutively plus one-year terms on the corresponding street terrorism enhancements as to each count; and one year for one of the prior prison term allegations. The court struck the sentence on count 7, a misdemeanor, and imposed and stayed the eight month term on count 8 pursuant to section 654.

DISCUSSION

*I. Admission of Evidence*

Robiatti and Blanchette argue the trial court erred in allowing Monteleone to rely on, and later admitting into evidence, the four photographs recovered from the cell phone Blanchette was holding because they were not properly authenticated and lacked foundation. We disagree.

A photograph is a writing, and a photograph must be authenticated before it and secondary evidence of its content may be admitted into evidence. (Evid. Code, §§ 250, 1401, subds. (a) & (b).) Generally, a photograph may be authenticated by the following: (1) "the testimony of a person who was present at the time a film was made

10

that it accurately depicts what it purports to show"; and (2) expert testimony. (*People v. Bowley* (1963) 59 Cal.2d 855, 859, 862.)

However, in *Valdez, supra,* 201 Cal.App.4th at pages 1434-1435, another panel of this court explained writings may be authenticated by other means. "Importantly, 'the fact that the judge permits [a] writing to be admitted in evidence does not necessarily establish the authenticity of the writing; all that the judge has determined is that there has been a sufficient showing of the authenticity of the writing to permit the trier of fact to find that it is authentic.' [Citation.] Thus, while all writings must be authenticated before they are received into evidence ([Evid. Code,] § 1401), the proponent's burden of producing evidence to show authenticity ([Evid. Code,] § 1400) is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]' [Citation.] The author's testimony is not required to authenticate a document ([Evid. Code,] § 1411); instead, its authenticity may be established by the contents of the writing ([Evid. Code,] § 1421) or by other means ([Evid. Code,] § 1410 [no restriction on 'the means by which a writing may be authenticated'] ). 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.] '"[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence. . . ."' [Citation.]" We review a trial court's ruling evidence has been properly authenticated for an abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

Here, circumstantial evidence established the authenticity of the four photographs. The contents of photographs can establish their authenticity. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372-1373 (*Olguin*).) Although the four photographs showed a man's body sans a head, Monteleone testified the tattoos on the man in the photographs matched Robiatti's tattoos. Robiatti does not dispute the tattoos

11

on the man in the photographs match his tattoos.  Additionally, both Monteleone and Abdelmuti stated the guns in the photographs matched the guns found in Blanchette's bedroom.  Finally, Abdelmuti testified the bedroom shown in the photographs matched Blanchette's bedroom.

The location where the photographs were found can also demonstrate they are authentic.  (*Olguin, supra,* 31 Cal.App.4th at pp. 1372-1373.)  The four photographs depicting a tattooed man without a head holding guns were recovered from a cell phone Blanchette held while Robiatti sat in the passenger seat when Wilder stopped the Prius.  Blanchette and Robiatti had just left the house where officers would find the guns in the bedroom that are depicted in the four photographs.  The four photographs include a date and time stamp that tend to establish the photographs were taken hours before officers searched Blanchette's home and found the arsenal.  Therefore, the contents of the photographs and the location where they were found provide a sufficient showing to permit the trier of fact to find the photographs were authentic.

Robiatti and Blanchette assert the photographs were not properly authenticated because there was no evidence who took them, where they came from, how they got on the cell phone, or who the phone belonged to.  They also complain there was no testimony, expert or lay, the photographs were not "composites" or "fakes," or that the date and time stamps were correct.  As the *Valdez* court stated, "'The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.]" (*Valdez, supra,* 201 Cal.App.4th at p. 1435.)  Both Robiatti's and Blanchette's defense counsel cross-examined Monteleone about the cell phone and the photographs.  And during closing argument they both argued the photographs were not properly authenticated.

Robiatti and Blanchette's reliance on *Beckley, supra,* 185 Cal.App.4th 509, to argue the photographs were not properly authenticated is misplaced.  In that case, the prosecution offered a photograph downloaded by a police officer from MySpace.com

12

purportedly showing a defense witness flashing a gang sign. (*Id*. at p. 514.) The officer could not testify from personal knowledge the photograph truthfully displayed the witness flashing the gang sign, and the prosecution did not offer any expert testimony the photograph was not a fake or had not been altered. (*Id*. at p. 515.) In concluding the photograph was not sufficiently authenticated, the *Beckley* court recognized "the untrustworthiness of images downloaded from the Internet," and noted websites are not monitored for accuracy, nothing contained on websites is under oath or subject to independent verification, and the content on websites can be manipulated from any location at any time. (*Id*. at pp. 515-516.) *Beckley* is factually distinguishable because it concerned evidence downloaded from the Internet. The photographs here were recovered from a password protected cell phone in Blanchette's possession.

Our case is more similar to *Valdez, supra,* 201 Cal.App.4th 1429, where the court held the prosecution did sufficiently authenticate printouts from defendant's MySpace page. In that case, the investigator had printed out the photographs a year before the offense at issue. (*Id*. at p. 1434.) Defendant did not dispute his own picture was the MySpace page icon identifying the owner of the page, and there were greetings addressed to him by name from a family member and other MySpace users and personal information connecting defendant with the MySpace page. (*Id*. at p. 1435.) The *Valdez* court reasoned that because "a reasonable trier of fact could conclude from the posting of personal photographs, communications, and other details that the MySpace page belonged to [the defendant]," it was for the jury to determine whether defendant authored it. (*Id.* at p. 1435.) The court also noted defendant did not dispute he was the person in a photograph forming a gang sign and the page was password protected for posting content. (*Id*. at p. 1436.) Again, Robiatti does not dispute his tattoos matched the tattoos of the person in the photographs and the cell phone was password protected. It was for the jury to decide what weight to afford the photographs.

13

Finally, Robiatti and Blanchette's contention Monteleone could not rely on the photographs as a basis for his expert opinion is meritless. "As long as [the] threshold requirement of reliability is satisfied, even matter ordinarily inadmissible, such as hearsay, can form the proper basis for an expert's opinion testimony. [Citation.]" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1121-1122 [gang expert may rely on conversations with gang members, on personal investigations of gang-related crimes, and on information obtained from other law enforcement].) Here, Robiatti and Blanchette note this was the first time Monteleone testified as an expert at trial but they do not argue he was not qualified to testify as an expert witness. In testifying as an expert, he could properly rely on those matters experts commonly rely on in forming their opinions. Thus, the trial court properly ruled Monteleone could rely on the photographs as a basis for his opinion, and properly admitted the photographs into evidence.

## II. *Sufficiency of the Evidence*

Robiatti and Blanchette argue insufficient evidence supports the jury's findings they committed counts 1 through 6 for the benefit of a criminal street gang, and Robiatti contends insufficient evidence supports his conviction for street terrorism. We address their contentions below.

"In considering a challenge to the sufficiency of the evidence . . . , [the appellate court] review[s] the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] [It] presume[s] every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither

14

reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

*A. Count 8-186.22, subdivision (a)*

Robiatti argues he could not be convicted of street terrorism because Blanchette was not an active participant in VFF. The Attorney General concedes the issue. Based on *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), we agree that Robiatti, who was not with another VFF gang member, could not be convicted of committing street terrorism.

The street terrorism substantive offense, section 186.22, subdivision (a), states: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . in the state prison for 16 months, or two or three years." There are three elements to the substantive street terrorism offense: (1) active participation in a criminal street gang; (2) knowledge the gang's members have engaged in a pattern of criminal gang activity; and (3) willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the gang. (*Albillar, supra,* 51 Cal.4th at p. 56.)

In *Rodriguez, supra,* 55 Cal.4th at page 1128, defendant acted alone in committing an attempted robbery. A jury convicted him of attempted robbery and active participation in a criminal street gang under section 186.22, subdivision (a). (*Rodriguez, supra,* 55 Cal.4th at p. 1129.) The issue in *Rodriguez*, like the issue here, was whether the third element of the crime described in section 186.22, subdivision (a)—willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the defendant's gang—can be satisfied by felonious criminal conduct committed by the defendant acting alone. (*Rodriguez, supra,* 55 Cal.4th at p. 1129.) The court held that it

15

does not, and expressly disapproved of prior cases to the extent they are inconsistent with *Rodriguez.* (*Id.* at p. 1137, fn. 8.)

The *Rodriguez* court began by analyzing the statute according to its "'plain, commonsense meaning . . . .'" (*Rodriguez, supra,* 55 Cal.4th at p. 1131.) The felonious criminal conduct referred to in the statute must be committed "'by members of that gang.'" (*Ibid.*) The word "'[m]embers,'" the court explained, is a plural noun. (*Id.* at p. 1132.) Therefore, the court reasoned "[t]he plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. [Citation.]" (*Ibid.*) Because defendant acted alone, he did not violate section 186.22, subdivision (a). (*Rodriguez, supra,* 55 Cal.4th at p. 1139.)

*Rodriguez* controls the outcome of the issue here. There was no evidence Blanchette was an active participant of VFF. Indeed, Monteleone opined Blanchette was not an active participant of VFF at the time of the offenses. Because the evidence at trial supports the conclusion Robiatti was not with another VFF gang member at the time of offenses—the only crimes the prosecution relied on to support the third element of the gang participation count—there is insufficient evidence to support the jury's conviction on that count. Accordingly, we reverse Robiatti's conviction on count 8.

B. *186.22, subdivision (b)*

Blanchette and Robiatti argue insufficient evidence supports the jury's finding they committed counts 1 to 6 for the benefit of a criminal street gang. Not so.

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." (§ 186.22, subd. (b)(1).)

16

In *Albillar, supra,* 51 Cal.4th at page 60, the California Supreme Court explained that although not every crime committed by gang members is related to a gang for purposes of the first prong, a crime can satisfy the first prong when it is committed for the benefit of a criminal street gang, at the direction of a criminal street gang, or in association with a criminal street gang. The *Albillar* court also explained the second prong, which requires the defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), need not encompass proof the defendant committed the crime with the specific intent to promote, further, or assist other criminal conduct by gang members. Instead, that subdivision "encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 65.)

The *Albillar* court stated a gang expert's opinion is admissible *as part of* the evidentiary showing on how the crimes can benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. (*Albillar, supra,* 51 Cal.4th at p. 63.)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

*1. Blanchette*

Blanchette argues insufficient evidence supports section 186.22, subdivision (b)(1)'s second prong, i.e., the specific intent requirement. We disagree.

With respect to the specific intent requirement, "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; see *Albillar, supra,* 51 Cal.4th at pp. 65-66.)

17

Here, contrary to Blanchette's assertion otherwise, there was sufficient evidence he committed counts 1 through 6 for the benefit of VFF because the record includes evidence from which the jury could reasonably conclude he knew Robiatti was a VFF gang member. The record demonstrates Blanchette and Robiatti spent hours together on the day of the incident. Robiatti has numerous VFF tattoos that are openly visible. When officers searched Blanchette's home, they found two guns that belonged to a known member of VFF. In the entertainment center in Blanchette's living room, officers found a notebook containing VFF gang symbols. On a cell phone Blanchette possessed, officers found recent photographs of Robiatti holding the gang's guns. From this evidence, the jury could reasonably conclude Blanchette welcomed a known VFF gang member into his home, provided a safe house for VFF's guns, romanticized his ties to criminal street gangs, and memorialized the occasion by taking photographs of Robiatti displaying the guns. Thus, there was sufficient evidence Blanchette committed counts 1 to 6 in concert with a known VFF gang member, and the jury's findings are supported by substantial evidence.

*2. Robiatti*

Robiatti contends insufficient evidence supports both prongs of section 186.22, subdivision (b)(1). Again, we disagree.

As to the first prong, it is true not every crime committed by a gang member is gang related, but "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*Albillar, supra,* 51 Cal.4th at pp. 60, 63.)

Here, there was overwhelming evidence Robiatti was an active participant in VFF. Additionally, officers observed Robiatti going in and out of Blanchette's home, where officers later found at least two weapons that belonged to a known VFF gang member. Later, when officers stopped Blanchette and Robiatti in the Prius, officers

18

found a gun under the passenger seat where Robiatti was sitting. The gun was wrapped in a grey bandana that was identical to another grey bandana found in Robiatti's pocket.

Monteleone testified one of VFF's primary criminal activities was weapons possession. He explained guns are extremely important to gangs because gang members use guns to commit violent crimes and instill fear in rival gangs and the community. He added that gangs hide their guns in "safe houses" where law enforcement would be unlikely to find them and gang members hide guns for other gang members. Based on a hypothetical that tracked the evidence in this case, he opined an active gang member who possesses guns benefits his gang because they can commit crimes for the gang, protect themselves from rival gang members, and assault rival gang members. Monteleone concluded this would enhance the gang member's reputation in the gang. Based on this evidence, the jury could reasonably conclude Robiatti, an active VFF gang member, possessed the guns for the benefit of VFF and hid VFF's weapons outside its territory to prevent law enforcement from finding them.

Robiatti complains the record is void of any evidence how the guns were transported to Blanchette's home, he and Blanchette were engaged in VFF activity or planned to commit a crime, VFF used or planned to use the guns to commit gang crimes, or rival gangs or community members were aware of the guns. Counsel elicited testimony on all these points from Monteleone on cross-examination, and the jury heard and rejected this testimony. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512 (*Garcia*).) On appeal, we view the evidence in the light most favorable to the judgment, and we cannot substitute our judgment for the jury's judgment. (*Albillar, supra,* 51 Cal.4th at pp. 59-60.)

*Garcia, supra,* 153 Cal.App.4th 1499, is instructive. In that case, another panel of this court held sufficient evidence supported the jury's finding defendant carried a loaded unregistered weapon in public for the benefit of a criminal street gang, based on evidence that is not as strong as the evidence in this case. In that case, officers stopped

19

defendant, an active gang member who had committed gang crimes, for a traffic violation and found the gun. (*Id.* at pp. 1502-1504.) Defendant contended he had been shot and he possessed the gun solely for self-defense. (*Id*. at p. 1512.) Based on the gang expert's testimony on the importance of guns in gangs and the respect gang members and gangs garner from possessing guns, this court held sufficient evidence supported the jury's finding on the street terrorism enhancement. (*Ibid*.) As we explain above, the record includes evidence from which the jury could reasonably conclude Robiatti, an active participant in VFF, possessed and hid VFF's guns in Blanchette's home.

With respect to the second prong, the *Albillar* court concluded section 186.22, subdivision (b)(1), requires the specific intent to promote, further, or assist in any criminal conduct by gang members, including the offense sought to be enhanced. (*Albillar, supra,* 51 Cal.4th at p. 66.) Because there rarely is direct evidence a crime was committed with the specific intent to benefit a criminal street gang, the trier of fact may infer the requisite mental state "from how people act and what they say." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.) Again, expert testimony is admissible to establish sufficient evidence of the street terrorism enhancement. (*Albillar, supra,* 51 Cal.4th at p. 63.)

As we explain above more fully, there was overwhelming evidence Robiatti was an active participant of VFF. Officers observed him visiting a home where officers later found weapons, including two guns that belonged to Duron, another known VFF gang member. Officers later stopped Blanchette and Robiatti and found a gun wrapped in a bandana that tended to establish Robiatti possessed the gun. Monteleone testified criminal street gangs cherish guns and use them to commit a variety of crimes. He also explained gang members hide guns for other gang members at safe houses where law enforcement officers are unlikely to find them. The jury could certainly rely on this evidence to reasonably conclude Robiatti had the specific intent to benefit VFF when he

20

possessed and hid the guns. To the extent Robiatti argues the jury's findings are improper because he was not with another VFF gang member, he is incorrect. (*People v. Rios* (2013) 222 Cal.App.4th 542, 563-564; see *Rodriguez, supra,* 55 Cal.4th at pp. 1138-1139.)

Robiatti's reliance on *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), and *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), is misplaced. In *Ramon, supra,* 175 Cal.App.4th 843, defendant was convicted of, among other things, receiving a stolen vehicle. The court explained the record was devoid of any evidence from which the expert could determine whether defendant and his passenger were acting on behalf of the gang or were acting on their own behalf. (*Id.* at p. 851.) The court noted its analysis might be different if the expert's opinion had included possessing stolen vehicles as one of the gang's activities. (*Id.* at p. 853.) In *Frank S., supra*, 141 Cal.App.4th 1192, there was insufficient evidence to support a gang enhancement on a finding minor carried a concealed dirk or dagger where the prosecution "did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Id.* at p. 1199.)

Here, Monteleone testified one of VFF's primary activities was possession of weapons, and there was expert testimony from which the jury could reasonably conclude Robiatti, an active participant in VFF, was hiding VFF guns outside its territory in a home where officers found gang indicia to prevent law enforcement from confiscating the guns. Monteleone testified both statutorily required predicate offenses involved the use of firearms. Thus, based on the entire record, there is sufficient evidence supporting the jury's finding Blanchette and Robiatti committed counts 1 through 6 for the benefit of a criminal street gang. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

21

*III. Ineffective Assistance of Counsel*

Robiatti and Blanchette claim they received ineffective assistance of counsel because their defense counsel did not object during closing argument to an alleged misstatement of law concerning the street terrorism enhancement. Not so.

"In order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.] Moreover, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' . . . If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate. [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 40-41, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

Robiatti and Blanchette rely on the following statement during the prosecutor's closing argument to argue his defense counsel was ineffective for failing to object: "So, believe it or not, he can actually assist, further, or promote his own criminal conduct. It's not like he has to promote somebody other than himself. He's a gang member himself." They claim the prosecutor's statement essentially eliminated from the jury's consideration section 186.22's second element, i.e., the specific intent element.

The prosecutor's statement correctly reflected the California Supreme Court's holding in *Albillar, supra,* 51 Cal.4th at page 65 that section 186.22, subdivision (b)(1), "encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 65.) To the

extent the prosecutor's statement was an *incomplete* statement of the law, neither Robiatti nor Blanchette were prejudiced.

The trial court instructed the jury with CALCRIM No. 200, "Duties of Judge and Jury," that admonished the jury to follow the law as the trial court explained it to the jury. The instruction added that if anything the attorneys said conflicted with the court's instructions, the jury must follow the court's instructions. Additionally, the court instructed the jury with CALCRIM No. 1401, which correctly provided the jury with section 186.22, subdivision (b)(1)'s elements. Therefore, Robiatti and Blanchette were not prejudiced by the prosecutor's statement.

## DISPOSITION

We reverse Robiatti's conviction for street terrorism, count 8. We affirm the judgments in all other respects. We direct the clerk of the superior court to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation, Division of Adult Operations.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.

23